(No. 23064.

NATHAN C. GINSBERG, Appellant, *vs.* SIDNEY J. GINSBERG *et al.* Appellees.

*Opinion filed October 24, 1935.*

500

SHEARER, O'MALLEY & SEARS, and KAYNER & KAYNER, (FRED. B. SHEARER, and BARNABAS F. SEARS, of counsel,) for appellant.

JOHN K. NEWHALL, and DAVID B. GIVLER, (OLNEY C. ALLEN, and DAVID J. PEFFERS, of counsel,) for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

This case comes before us by appeal from the circuit court of Kane county, in which Nathan C. Ginsberg, the appellant, filed his complaint to contest the will and four codicils thereto executed by Rachael L. Ginsberg. The complaint charged undue influence on the part of the defendants, "or one or more of them," and also a want of testamentary capacity. The defendants were Golda Stollmack, Ethel G. Brown, Jean H. Waxenberg, Gene Allen Waxenberg, Sidney J. Ginsberg, Mollie I. Ginsberg and Ruth E. Ginsberg. The last three were also named defendants in their representative capacities as executors and trustees.

The testatrix died in Los Angeles, California, January 29, 1933. Excepting Gene Allen Waxenberg, she left the parties to the suit as her children and only heirs-at-law. Her husband had pre-deceased her. Her estate was made up of buildings valued, respectively, at $70,000 and $40,000, a homestead worth $5000, stocks and securities totaling $41,968.25, and household goods, jewelry and a stock of merchandise worth $12,367.83. She left a going business known as Ginsberg's Department Store. All the property was located in Aurora. She made her will on May 11, 1925, in Aurora. By it she gave to her daughter Mollie Ginsberg the family home, furniture, fixtures, silver, her jewelry and $15,000. She made Mollie, Jean and Ruth trustees of the residue of her estate, with power to manage, control, sell or lease, as they saw fit. The trust was to terminate in twenty years. The only provision made for the appellant was that he should receive one-seventh of the sale price of the real estate located at 8-10 South Broadway. This property was worth approximately $70,000. His share was to be held in trust after such sale and was to be paid to him in ten annual installments, one of which was to be due on January 1 of each year. In the event of his death before payment to him was completed, the un-

paid portion was to be divided equally among the remaining six children. The residue of the estate was to be divided equally among the children, with the exception of Nathan. The daughter Ethel's share was charged with the debts due the testatrix from Otto A. Brown, her husband. Any devisee or legatee who sued to contest the will forfeited his legacy or devise and such legacy or devise was to be added to the residuary estate. By the sixth and last clause the testatrix declared that the inequalities found in the will were not only to be attributed to her own estimate of the needs, service and deserts of her children but were also attributable to the wishes of her late husband, Isaac A. Ginsberg.

The testatrix executed the first codicil in Aurora on December 26, 1925. It provided that the share of her daughter Ethel should be revoked if she continued to be the wife of Otto A. Brown. In such event her share was to go equally to the other children, except Nathan.

On September 24, 1926, at Aurora, the testatrix executed the second codicil, by which she altered the first codicil so as to give Ethel one-sixth of the income from the trust estate while she remained the wife of Otto A. Brown. At his death the restriction was removed, but if Otto survived Ethel the income and *corpus* of her one-sixth of the trust estate was to go to the other children, excepting Nathan.

On February 3, 1931, at Los Angeles, California, the testatrix executed the third codicil. By the first of its six clauses she removed her daughter Jean as executrix and trustee and appointed her son Sidney. This clause also gave him an option to purchase the Ginsberg Department Store at whatever price the two remaining executors and trustees should fix, without the approval of a court. By the second clause Ethel G. Brown was appointed substitute executrix and trustee in the event any of the three named should decline or be unable to serve. The third

clause provided that none of the executors and trustees should be required to give bond. The fourth clause provided that if either Jean or Golda brought a suit, action or proceeding against the testatrix or any or all of her children during her lifetime, for any purpose, reason or cause whatsoever, such action should constitute an immediate revocation of the entire interest of such daughter or of anyone who aided or abetted such action or was responsible therefor. The fifth clause provided that if any person claimed other than by the will he should be cut off with one dollar.

The fourth codicil was executed in Los Angeles on May 27, 1931. It recited the fact that Jean had brought an action in Illinois to have the testatrix declared incompetent, but that, although deeply grieved thereby, she bore no ill-will toward Jean. It set aside the forfeiture which would otherwise have resulted under the fourth clause of the third codicil, but Jean's share was charged with the attorney's fees, costs and expenses borne by the testatrix in defending the suit.

Isaac A. Ginsberg had been a merchant in Aurora about thirty-five years before he died, on February 13, 1923. By his will he left his property to his widow. She had been suffering from high blood pressure and had not been in good health before Isaac's death. After his death the children, except Ethel and Nathan, lived with their mother. Mollie had charge of the household, did the buying for it and paid the servant. The mother never went out alone and was always accompanied by at least one daughter. Sidney, Golda, Jean and Ruth helped about the store at different times. On one occasion, when Sidney went to California, Nathan had charge of the store. The children were attentive to their mother. On her part, Rachael showed great affection for them, including Nathan, and for his two sons and his wife, Florence. Nathan lived in Chicago and had an established jobbing business in ladies'

ready-to-wear. On one occasion the mother cried and complained that the girls were spending too much money remodeling the house, but the daughters had their way despite their mother's protest. The mother talked to the daughters who lived with her about making her will. Ruth made the appointment and accompanied her to the office of the attorney who drew it. In response to Ruth's telephone call Jean left the store and went to the lawyer's office. Parts, if not all, of the will were read to the mother before she signed it. On one occasion, in 1927, when Mrs. Ginsberg was riding in an automobile in Aurora she saw some old friends on the street. She tried to stand up and was pulled back by the daughters who were with her. The car did not stop. On two or more occasions, when friends were present, the daughters kept their mother from taking part in the conversation by saying, when she attempted to take a part, "Mother, never mind about that," and the like.

In September, 1930, after an extended absence, Sidney Ginsberg told his mother that he would not return to the department store unless he received $10,000. He gave as his reason for this demand the fact that he had discovered that he was not named as one of the executors by her will. His demands were met and he took charge of the store.

After Isaac's death the testatrix spent her winters in California. She went there in 1930 and remained until her death. Mollie, Ethel and Ruth lived with her. About January 1, 1931, Sidney went to California, and next day Golda followed by airplane. On this occasion Nathan took charge of the store at Golda's request. It does not appear whether Sidney was in California on February 3, 1931, when the third codicil was added to the will. Golda met Jean in San Francisco and telephoned her other sisters at Los Angeles asking that they send a car for her. Instead, two of them came to San Francisco and talked with Jean and Golda. Later, in Los Angeles, Golda and Jean were denied admittance to the apartment to see their mother.

Golda saw her mother at a doctor's office when the mother went there for treatment. On leaving the doctor's office Golda fought her way into the automobile, and had further argument with Mollie, Ethel and Ruth at the mother's apartment. No connection is shown between these untoward happenings and the will or any of the four codicils. Shortly thereafter Golda was married, and before going on a trip with her husband she went to the apartment building and saw Ruth and Ethel in the lobby but was not permitted to see her mother. After Jean and Golda returned to Aurora, Sidney left the Ginsberg home and would not speak to them.

The court refused to admit testimony as to statements made by various appellees showing ill-feeling toward Nathan's wife, Florence. Conversations were excluded which showed that shortly before the will was made those daughters living at home were opposed to Nathan being remembered in the will or to Florence being indirectly benefited by it. It excluded conversations with reference to Jean and Golda's efforts to see their mother in California early in 1931 and what was said during the disturbance at the apartment building when Golda forced an entrance. Conversations were excluded which took place when Golda attempted to see her mother and introduce her husband and when she attempted to see her mother to tell her good-bye before leaving for China. Objection was sustained to Golda's testimony as to the contents of a telegram purporting to have been sent by Sidney to Sol Zemansky in California early in 1931, to the effect that Golda and Jean must not see their mother and threatening that Sidney would take drastic action to prevent them from doing so. Israel Joseph was not permitted to testify that in his opinion the testatrix did not have the ability to transact ordinary business. When the appellant rested his case in chief the court allowed appellees' motion to strike all of his evidence and directed the jury to find the issues for the appellees.

The first assignment of error to be considered is the appellant's contention that the court erred in excluding testimony above set out. The complaint alleges that the defendants, (appellees,) or one or more of them, procured the execution of the will and codicils by the exercise of undue influence. No conspiracy is charged. The rule is that statements or admissions made by a devisee concerning the testamentary capacity of a testator or acts of undue influence in procuring the execution of a will, while admissible where the interests of all the devisees are joint, are not admissible where their interests are separate. (*Mc-Cune* v. *Reynolds*, 288 Ill. 188, 193; *McMillan* v. *McDill*, 110 id. 47.) Appellant relies upon *In re McKie's Estate*, 107 S. C. 57, 91 S. E. 978, but that decision is not in harmony with our own. The interests of the appellees in this case are several. There is no joint tenancy, and at the end of the twenty years fixed as the life of the trust each is to receive his share of the *corpus*. We have already pointed out that there is no charge of conspiracy. For these reasons the statements of the several appellees sought to be introduced in evidence were properly excluded. This includes the telegram purporting to have been sent by Sidney Ginsberg to Sol Zemansky. This testimony was properly excluded for the further reason that the objection was made that the telegram itself was the best evidence of when it was sent, by whom and what it contained. No foundation was laid to excuse its production. We can not agree with the appellant's contention that a telegram is an act.

The court did not err in sustaining the objection made to the offer to prove by Israel Joseph that in his opinion the testatrix lacked sufficient mental capacity to transact ordinary business. He admitted that he had never transacted any business with her and had never discussed business matters with her. His conversations with her had been of a general nature and for the most part about

their families. He did not know what education she had, whether she was able to add or subtract, and had never seen her sign her name, although he said he once had seen what was represented to him to be her signature. In *Baddeley* v. *Watkins,* 293 Ill. 394, 406, we held that unless the witness details conversations, incidents, facts and circumstances sufficient to impress the mind of a man of common experience that such witness has a knowledge of the testator's mental condition, and that his opinion is not a guess, supposition or speculation, his opinion should not be received in evidence, citing *Hettick* v. *Searcy,* 278 Ill. 116, and other cases. (See, also, *Britt* v. *Darnell,* 315 Ill. 385, 400.) Applying the test laid down in these cases, Israel Joseph did not state sufficient facts, circumstances and conversations to make his testimony admissible.

The appellant insists that the trial court did not have the power to direct a verdict at the close of his evidence. He contends that the effect of Rule 25 of this court is merely to change the order of proof by requiring the contestants to introduce their proof first, and that the burden of proof remains as it was before the Civil Practice act was passed and Rule 25 was adopted. He contends that section 13 of article 4 of the constitution would be violated if Rule 25 is held to put the burden of proof upon the contestants of a will. His argument is that the Civil Practice act can embrace the subject of procedure alone, and that a change of the burden of proof amounts to a change in the substantive law of wills, which, he says, would contravene the constitutional provision that no act shall embrace more than one subject "and that shall be expressed in the title." Rule 25 provides: "In proceedings to contest the validity of a will, testament or codicil, the contestant shall in the first instance proceed with proof to establish the invalidity of such instrument; and the proponent may then present evidence to sustain the will, testament or codicil."

The appellant relies upon *Donovan* v. *St. Joseph's Home,* 295 Ill. 125, and *Klein* v. *Schommer,* 347 id. 632, to sustain his contention that the rule involving the burden of proof had become part of the substantive law of wills. The rule that in a will contest the burden of proof is upon the proponents was established in *Rigg* v. *Wilton,* 13 Ill. 15, where we observed that our statute was copied from that of Kentucky and adopted the construction given it by the Kentucky Supreme Court. The cases relied upon by the appellant do not hold that this rule is a part of the substantive law of wills. It is clear that instead it was always a rule of procedure. It comes clearly within the inherent rule-making power of this court. (*People* v. *Callopy,* 358 Ill. 11.) The contention that a change was made in the substantive law of wills by the adoption of Rule 25 can not be sustained.

The appellant's contention contains the added objection that the trial court was not authorized or empowered to direct a verdict at the close of the evidence offered by a contestant. A motion to direct a verdict in a will contest has been held to be governed by the same rules as govern such motions made in actions at law. (*Brownlie* v. *Brownlie,* 351 Ill. 72, 78; *McCune* v. *Reynolds,* 288 id. 188, 190.) The party resisting such a motion is entitled to the benefit of all the evidence, considered in its aspect most favorable to him, together with all reasonable presumptions to be drawn therefrom. The motion raises the question whether there is any evidence fairly tending to prove the allegations of the bill. If such evidence has been educed, although it may be opposed by the greater weight of the countervailing testimony, the case should be submitted to the jury. (*Brownlie* v. *Brownlie,* 351 Ill. 72, 78; *Miles* v. *Long,* 342 id. 589.) It can scarcely be urged that in any action at law it would be improper for the defendant to interpose a motion to direct a verdict at the close of the plaintiff's evidence. If no evidence tending to prove the allegations of

the declaration, bill or complaint were introduced, or if but a bare scintilla of evidence had been educed by the plaintiff, the court should allow such a motion. (*Libby, McNeill & Libby* v. *Cook,* 222 Ill. 206.) The question then presented by the appellees' motion was whether the appellant had educed any evidence fairly tending to prove either the allegation of undue influence or that of want of testamentary capacity.

We need not discuss at length the claim that the appellant's evidence shows want of testamentary capacity. All that bears upon the subject, even remotely, is that Mrs. Ginsberg had been affected with high blood pressure for some time before her husband's death and that she was an invalid at the time she made her will and the codicils. This, and the fact that her children were solicitous of her welfare and that they did not permit her to go about without at least one of the daughters with her, and did not permit her to engage in conversations on two or more occasions, are not sufficient to constitute proof of want of testamentary capacity.

It is seriously contended by the appellant that his evidence establishes undue influence. Undue influence has been defined as "any improper or wrongful constraint, machination or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely." (*McCune* v. *Reynolds,* 288 Ill. 188; *Smith* v. *Henline,* 174 id. 184.) Where a contestant charges undue influence, the burden of proving it is upon him. The fact that a fiduciary relation exists between the testator and the beneficiaries of his will is not sufficient, alone, to establish such a charge. Nor does the mere fact that beneficiaries under a will stand in a fiduciary relation to the testator put upon them the burden to show an absence of fraud and undue influence, where there is no evidence which tends

to show that they were in any way instrumental in procuring the execution of the will. (*McCune* v. *Reynolds, supra; Lloyd* v. *Rush,* 273 Ill. 489.) Undue influence that will avoid a will must be directly connected with the execution of the instrument itself and must be operating when the will is made. (*Wickes* v. *Walden,* 228 Ill. 56.) The influence must also be directed specially towards procuring the will in favor of particular individuals and it must be such as to destroy the testator's freedom of will. The will must be rendered obviously the result of the mind and brain of someone other than the testator. (*Snell* v. *Weldon,* 239 Ill. 279.) The only fact that is shown here in connection with the making of this will is that the mother went with her daughter Ruth to her lawyer's office and after they were there Ruth called her sister Jean at the Ginsberg store and asked her to come over, telling her that their mother was about to make her will. It is true that there was testimony that the mother had discussed the making of a will with her children, and that the children, or some of them, had objected to the appellant being remembered. But in spite of this the mother did make provision for Nathan. The fact that the distribution was unequal does not, of itself, invalidate the will. *Graham* v. *Deuterman,* 206 Ill. 378.

The appellant relies upon *England* v. *Fawbush,* 204 Ill. 384, *Weston* v. *Teufel,* 213 id. 291, *Leonard* v. *Burtle,* 226 id. 422, *Yess* v. *Yess,* 255 id. 414, *Donnan* v. *Donnan,* 256 id. 244, *Gum* v. *Reep,* 275 id. 503, *Aftalion* v. *Stauffer,* 284 id. 54, and *Dial* v. *Welker,* 328 id. 56, to sustain his contention that his proof establishes undue influence, and that therefore he had a right to have his case submitted to the jury. Without reviewing in detail the facts shown in those cases, it is enough to say that the testimony before us does not, even when considered in its aspect most favorable for the appellant, tend to prove undue influence within the requirements heretofore established by our decisions.

The trial court did not err in directing the jury to return a verdict for the appellees.

For the reasons stated, the decree dismissing the complaint for want of equity is affirmed. *Decree affirmed.*