MILOW LLOYD *et al.* Appellants, *vs.* ADDISON RUSH *et al.* Appellees.

*Opinion filed June 22, 1916.*

1. WILLS—*when opinion of a non-expert witness is entitled to no weight.* The opinion of a non-expert witness that the testatrix was not of sound mind and memory is entitled to no weight, where the witness does not state any facts or circumstances which could induce a reasonable belief of unsoundness of mind; and it is not sufficient that the witness testifies that the testatrix was sick and suffering severely at the time concerning which he testified.

2. SAME—*when beneficiaries cannot be charged with undue influence.* Beneficiaries in a will cannot be successfully charged with undue influence where it does not appear that either of them knew the testatrix was contemplating the execution of the will, or had made one, until they were called in by one of the attesting witnesses, at the request of the testatrix, when the will was signed.

3. SAME—*when fact of fiduciary relation does not affect question of burden of proof.* The mere fact that beneficiaries in a will may stand in a fiduciary relation to the testatrix does not put upon them the burden of showing an absence of fraud and undue influence, where there is no evidence tending to show they were in any way instrumental in procuring the execution of the will.

4. SAME—*effect of motion to direct verdict in will contest case.* A motion to direct a verdict upon the issue of undue influence or testamentary capacity in a will contest case presents the question whether there is any evidence, considered in its most favorable aspect and aided by all reasonable presumptions which may be drawn therefrom, fairly tending to prove such issues, and if there is no evidence fairly tending to prove them it is proper to direct a verdict in favor of the proponents.

APPEAL from the Circuit Court of Rock Island county; the Hon. WILLIAM T. CHURCH, Judge, presiding.

ROBERT R. REYNOLDS, W. C. ALLEN, and J. T. & S. R. KENWORTHY, for appellants.

CURTIS & SIMONSON, and SEARLE & MARSHALL, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

Milow Lloyd and Luella L. Titterington, two of the heirs-at-law of Emma C. Lloyd, deceased, filed their bill in the circuit court of Rock Island county against Lovina Rush, Walter J. Lloyd, Eunice Laflin, Asenath Baker, Cornelius Baker and Addison Rush, individually and as executor, to contest the validity of an instrument which had been admitted to probate by the county court of Rock Island county as and for the last will and testament of Emma C. Lloyd, deceased. The grounds of contest set up in the bill were mental incapacity and undue influence exercised by Addison Rush and Lovina Rush. Lovina Rush and Addison Rush appeared and answered the bill, denying the allegations charging that Emma C. Lloyd was at the time of making her will of unsound mind and memory, and the allegations charging that the will was obtained through undue influence exercised by them. Thereafter all the other persons made defendants to the bill were, upon motion of the complainants, joined as complainants. A replication having been filed to the answer, an issue at law whether the writing produced be the will of Emma C. Lloyd, deceased, was made up and submitted to a jury. The proponents offered all their evidence, including the testimony of numerous witnesses, in chief. The contestants then offered their proof. At the conclusion of the taking of testimony on behalf of the contestants, the court, upon motion of the proponents, instructed the jury to return a verdict finding that the writing produced is the last will and testament of Emma C. Lloyd, deceased. After the proponents had moved the court to give the peremptory instruction, the contestants, by cross-motion, asked leave to amend their bill by adding thereto, immediately preceding the prayer for relief, allegations which, in substance, charged that James

M. Beardsley, at the instigation of Lovina Rush and Addison Rush, induced Emma C. Lloyd to make a will; that Emma C. Lloyd directed Beardsley to have a will prepared making certain devises and bequests; that Beardsley prepared or had prepared a will in and by which the directions of Emma C. Lloyd were not carried out and which was materially different from that directed by her to be made, and that Beardsley, with the aid and assistance of Lovina Rush and Addison Rush, at a time when Emma C. Lloyd was very ill and debilitated in mind and body, procured the execution of said will without advising her of the provisions therein which were at variance with her declared intention; that Emma C. Lloyd, therefore, did not know the provisions of the will which she executed and that the same was fraudulently obtained from her. The court refused to permit the proposed amendment to the bill but gave the peremptory instruction requested by the proponents. The jury returned a verdict in favor of the proponents, as directed by the court. After overruling a motion for a new trial the court entered a decree finding the instrument in controversy to be the last will and testament of Emma C. Lloyd, deceased, and dismissing the bill at the complainants' costs. From that decree the complainants have prosecuted this appeal.

The only ground relied upon by appellants for reversal is that the court erred in directing the jury to return a verdict in favor of appellees.

Emma C. Lloyd was at the time of her death, on August 9, 1912, about sixty-seven years of age. She had never been married. The appellants, Milow Lloyd, Luella L. Titterington, Asenath Baker, Walter J. Lloyd and Eunice Laflin, and the appellee Lovina Rush, are her surviving brothers and sisters and her only heirs-at-law. Appellee Addison Rush is the husband of Lovina Rush. On June 7, 1912, Emma C. Lloyd executed the will in controversy. The first clause of her will provided for the payment of

her debts and funeral expenses. The second clause was as follows:

"*Second*—I give, devise and bequeath unto my sister Lovina Rush the sum of ten thousand (10,000) dollars in consideration of her loving care and kindness to me during the last seven years, and in addition to said bequest I also give, devise and bequeath to her all personal property of every description, excepting moneys, stocks, bonds, mortgages, notes or other interest-bearing securities, to have and to hold unto said Lovina Rush, her heirs and assigns forever. In case of the death of said Lovina Rush prior to my decease, then in that event it is my will that said sum of ten thousand (10,000) dollars and said described personal property, excepting said moneys, stocks, bonds, mortgages, notes and other interest-bearing securities, shall vest in and become the property of Addison Rush, husband of said Lovina Rush."

By the third clause the testatrix devised to her sister Luella L. Titterington a lot in the city of Rock Island, and by the fourth clause all the rest, residue and remainder of her estate was devised and bequeathed in equal parts to her brothers and sisters named, as follows: Milow J. Lloyd, Walter J. Lloyd, Lovina Rush, Asenath Baker, Eunice Laflin and Luella L. Titterington. By the fifth and last clause of the will the testatrix nominated Addison Rush sole executor of the will without bond, and gave the executor power to sell, dispose of and convey any and all real estate of which she should die seized or possessed, except the lot devised to Luella L. Titterington, at such price and upon such terms as to the executor should seem to be for the best interest of the estate.

The testatrix had resided on a farm in Rock Island county all her life. This farm, consisting of 160 acres, had belonged to her father, Joseph W. Lloyd, in his lifetime, and after the death of her father and mother she claimed to own it. During the latter part of his life Lloyd was blind,

and in addition to his wife and daughter Emma, another daughter, Eunice Laflin, and her husband, resided with the Lloyd family, the husband of Eunice Laflin doing the farm work. After the death of Joseph W. Lloyd, Eunice Laflin and her husband continued to reside with the Lloyd family under the same arrangements as existed before the death of Joseph W. Lloyd until 1906, when the appellees, Lovina Rush and Addison Rush, became members of the Lloyd family, and Eunice Laflin and her husband thereupon left the farm. A few years before her death Mrs. Lloyd became paralyzed and thereafter until her death was unable to walk. About the time Lovina Rush and her husband took up their residence with Emma C. Lloyd and her mother Miss Lloyd became afflicted with rheumatism, which continued to become worse, until during the last year of her life she was practically helpless. During all this period Lovina Rush attended to the household duties and took care of her sister and her mother during their sickness, and Addison Rush, under the direction of Miss Lloyd, attended to the farm. Dr. Allen J. Miller had been the family physician for many years. Beginning on June 4, and continuing for nine consecutive days thereafter, Dr. Miller administered to Miss Lloyd a treatment which he designated the Phylacogen treatment for rheumatism. This treatment, according to the testimony of Dr. Miller, consisted of the hypodermic injection of a certain vaccine. He testified that the vaccine contained nothing that would tend to stupefy the brain or affect the mind in any way, and that the only complaint made by Miss Lloyd as a result of this treatment was of soreness for two or three days at the place where the needle had been inserted.

James M. Beardsley, who resided in the city of Rock Island, was an uncle of Emma C. Lloyd, he being a brother of her mother. Miss Lloyd having sent word by Beardsley's wife that she wanted to see him, Beardsley on June 6, 1912, together with his wife, went to the Lloyd homestead.

Miss Lloyd took Beardsley into her bed-room and told him that she wanted to make a will. Beardsley told her to get a lawyer, and mentioned the names of two lawyers practicing in the city of Rock Island. Neither of the attorneys suggested by Beardsley being satisfactory to her, she named Hugh E. Curtis as the attorney she desired to draw her will. Beardsley then told her it was not necessary to have Curtis come to the farm; that she could tell him (Beardsley) what disposition she desired to make of her property and he would make a memorandum of the provisions and take it to Curtis and Curtis could draw the will from the memorandum. At first she stated that she wanted her sister Mrs. Rush to have one-third of the farm and all of the personal property, the balance of the farm to be divided among her other brothers and sisters, and Beardsley made a memorandum in accordance with this expressed desire. After he had made this memorandum she asked him if she could not leave Mrs. Rush $10,000 or $12,000 or $15,000 for her services in taking care of herself and her mother during the last seven years and make it a charge upon the real estate and then divide the property among the brothers and sisters. Beardsley suggested that $10,000 was a large sum, but she said that Mrs. Rush deserved more than that and told Beardsley to "put in $10,000." She further told him that she wanted to leave a lot which she owned in the city of Rock Island to her sister Luella L. Titterington, and the balance of her property should be divided equally among all of them, and that she wanted Addison Rush to be executor without bond. Thereupon Beardsley made another memorandum in accordance with the directions last given by her. Beardsley and Miss Lloyd were the only persons in the bed-room during this conversation concerning the making of the will. Beardsley returned to the city of Rock Island the same day and the following morning called upon Hugh E. Curtis, gave him the memorandum last made by him and told him that Miss Lloyd desired a will drawn

as soon as possible. Curtis prepared the intrument in controversy from the memorandum left with him by Beardsley, and delivered it, together with a copy, to Beardsley about noon of June 7, 1912. Beardsley asked one of his former employees, John H. Ransom, to go with him to the Lloyd farm to witness a will. They arrived at the farm between two and three o'clock in the afternoon and found Miss Lloyd in bed. Beardsley went into the bed-room alone and told her that he had "got it all fixed up" and at her request read the will to her. He then asked her if she wanted to read it herself. She replied that she did, and read both the instrument which she thereafter executed and the copy, after which she said it was all right. Beardsley asked her if she wanted Mr. and Mrs. Rush present. She replied that she did, and Beardsley then called Ransom and Mr. and Mrs. Rush, telling them that Miss Lloyd wanted them to see her sign her will. Ransom came into the room first, then Mrs. Rush and a little later Mr. Rush, and the will was there duly executed by Emma C. Lloyd in the presence of these parties, Beardsley and Ransom signing the will as attesting witnesses.

Eighteen witnesses called by the proponents testified that Emma C. Lloyd was during her lifetime of sound mind and memory and capable of transacting ordinary business. These witnesses included James M. Beardsley and John H. Ransom, the attesting witnesses to the will, who testified that she was of sound mind and memory when she executed the will; Mrs. Beardsley, who visited her at her home on the day preceding the execution of the will and on two occasions subsequent thereto; Dr. Miller, the physician who had attended upon her for many years preceding her death and who saw her each day from May 1 to June 12, 1912; various mechanics who had worked upon the Lloyd buildings during the summer and fall of 1911; some of the neighbors who had called upon her about the time of the execution of the will; and a school teacher who

boarded with her a considerable portion of the time from the fall of 1910 to June 1, 1912.

Lowell Titterington, a son of Luella Titterington, was called as a witness by appellants. He testified that about the middle of June, 1912, he, together with his mother and his aunt, Mrs. Laflin, went to the Lloyd farm, arriving there about two o'clock in the afternoon; that Mrs. Rush met them at the door and invited them to enter the house; that his mother asked Mrs. Rush how Miss Lloyd was, and Mrs. Rush replied that she was very sick, and asked them if they wanted to go into her room and see her; that all of them went into her bed-room; that she was in bed and appeared to be "in a sort of a stupor;" that she made no move at all when they entered the room until Mrs. Rush said, "This is Eunice and Ella," and that she "kind of roused up a little" but said nothing; that the witness was on the other side of the bed, and Mrs. Rush said, "This is Lowell," and that she "kind of roused up again" as though it was all she could do to move; that his mother asked her how she felt, and she replied, "Not very good;" that Miss Lloyd did not appear to know them when they entered the room; that the witness remained in the room ten or fifteen minutes; that he later returned to her room before he left for home, and she then recognized him and told him she wanted him to come back again.

Mrs. Harriet Taylor Crawford, called by appellants as a witness, testified that she lived near the Lloyd farm; that she visited Miss Lloyd at her home on one occasion during the period she was taking treatments from Dr. Miller for rheumatism; that she was sitting in a chair in the dining room; that she was suffering and told the witness that she was taking the new treatment for rheumatism; that it was pretty severe and that she did not know whether it would help her or not. This witness was then asked whether in her opinion Miss Lloyd was on this occasion of sound mind and memory, and she answered, "The way she

was suffering I don't see how she could be." Upon motion by appellees this answer was stricken. Other questions subsequently propounded to this witness by the attorneys for appellants called for her opinion upon the mental condition of the deceased at the time referred to by her, but she insisted that she could answer the question in no other way than that in which she had answered it. On cross-examination she stated that she had known Miss Lloyd for many years and had frequently called upon her at her home; that she did not mean that during these years she was of unsound mind—that she was not, but she had never seen her suffering before; that she meant that on the particular occasion referred to in her direct examination Miss Lloyd was suffering so that she thought she might not be able to transact business at that time:

Mary I. Weiss, called as a witness by appellants, testified that she lived on a farm adjoining the Lloyd farm; that she had known Emma C. Lloyd for fifteen years; that the witness called upon her at her home on one occasion while she was taking treatments from Dr. Miller for rheumatism; that she was then in bed; that the witness went into her room and asked her how she felt, and she said she "wasn't very good." The witness was then asked whether in her opinion Miss Lloyd was on this occasion of sound mind, and replied: "Well, I am not a physician; I am not in position to say that she was of sound mind." She was then again asked whether in her opinion she was of sound mind when she saw her upon this occasion, and replied: "Well, it has always been a mystery to me whether she was during this time; of course, up to that time I would say that I never saw her when I thought she wasn't in her sound mind."

This was all the testimony offered by appellants bearing upon the mental condition of Miss Lloyd. The testimony of each of these three witnesses was simply to the effect that Miss Lloyd was sick and suffering severely at the time

273 — 32

concerning which they testified. There was nothing in the testimony of any of them that tended to prove mental unsoundness. Only two of these witnesses expressed an opinion regarding the mental condition of the testatrix, and their opinion was entitled to no consideration whatever, as no facts or circumstances were testified to upon which an opinion bearing upon the mental condition of Miss Lloyd could be based. The opinion of a non-expert witness that a testator is not of sound mind and memory is entitled to no weight when he states no facts or circumstances which could induce a reasonable belief of unsoundness of mind. (*Brainard* v. *Brainard,* 259 Ill. 613.) The court did not err in directing a verdict so far as this issue was concerned.

The bill charged that the will was procured by the undue influence of Lovina and Addison Rush. There is a complete lack of proof to sustain this charge. It does not appear that either Lovina Rush or her husband knew that Miss Lloyd was contemplating making a will, or had made one, until they were summoned by Beardsley to witness the execution of the instrument. "Undue influence that will avoid a will must be 'directly connected with the execution of the instrument and be operating when the will is made. It must be influence specially directed toward procuring the will in favor of particular parties, and be such as to destroy the freedom of the testator's will and render the instrument obviously more the offspring of the will of others than of his own.'—*Snell* v. *Weldon,* 239 Ill. 279." *Bowles* v. *Bryan,* 254 Ill. 148.

It is insisted that a fiduciary relation existed between Addison Rush and Miss Lloyd, and therefore the burden was upon him and his wife to prove an absence of fraud and undue influence. We are of the opinion that the facts proven were not sufficient to establish the existence of a fiduciary relation; but even if such relation had been established, in the absence of any showing that either of them was in some way instrumental in procuring the making of

the will the burden did not rest upon them to show an absence of fraud or undue influence. *Bauchens* v. *Davis, 229* Ill. 557.

The court properly refused to permit the appellants to amend their bill after the evidence had all been presented, as the allegations contained in the amendment did not conform to the proof made. There was nothing shown tending to prove that Beardsley acted at the instigation of Lovina and Addison Rush, or that Beardsley, with the aid and assistance of Lovina and Addison Rush, at a time when Miss Lloyd was ill and debilitated in mind and body, procured the execution of the will without advising her of the provisions therein which were at variance with her declared intention, or that Miss Lloyd did not know the provisions of the will and that the same was fraudulently obtained from her. Miss Lloyd, without the knowledge of Lovina or Addison Rush, solicited Beardsley to procure the drafting of her will. It is true that there is proof that in some particulars the will as drafted did not conform to the memorandum Beardsley made at the time he received the directions from Miss Lloyd. For instance, Miss Lloyd informed Beardsley that she desired to make the bequest to Mrs. Rush in consideration of the services she had performed, and in drafting the will a provision was inserted that in case of the death of Mrs. Rush prior to her decease the bequest of $10,000 and the personal property bequeathed should become the property of Addison Rush. In the directions given Beardsley, Miss Lloyd indicated that she desired to bequeath to Mrs. Rush all her personal property. As the will was drafted she bequeathed to her all her personal property except moneys, stocks, bonds, mortgages, notes or other interest-bearing securities. This exception was inserted by the attorney who drew the will. Beardsley was directed to have the will provide that Addison Rush should be the executor thereof without bond. As drawn, the will so appointed Addison Rush executor and

contained an additional provision that he should have the
power to sell, dispose of and convey any and all real estate
of which the testatrix should die seized or possessed, ex-
cept the lot in Rock Island, at such price and upon such
terms as should seem to him to be for the best interests of
the estate. Beardsley testified that in these particulars the
will as drawn did not follow specifically the directions as
given him by Miss Lloyd. The testimony discloses, how-
ever, that Beardsley read the will over to Miss Lloyd be-
fore she executed it, and that she read it twice herself and
discussed some of its provisions with him, commenting
particularly upon the exception in reference to the personal
property. She executed the instrument and delivered it to
Beardsley for safe keeping and retained a carbon copy, stat-
ing that she would keep the copy and would let him know
if she desired to make any changes. All the testimony is
to the effect that Miss Lloyd thoroughly understood all the
provisions of the instrument which she executed and that
the same was drawn according to a plan which she had
formulated and had had in contemplation for many months.

Where a motion is made to direct a verdict upon the
issue of undue influence or testamentary capacity in a will
contest case the rule is the same as applies to such a motion
in a suit at law, and the party resisting the motion is en-
titled to the benefit of all the evidence in its most favorable
aspect to him and of all presumptions that may be reason-
ably drawn therefrom. (*Yess* v. *Yess,* 255 Ill. 414.) The
question presented by a motion to direct a verdict in such a
case is whether there is any evidence fairly tending to prove
the cause of action or fact affirmed. (*Geiger* v. *Geiger,*
247 Ill. 629.) As there is no evidence in this record fairly
tending to show that the testatrix was of unsound mind or
that the will was procured by the exercise of undue influ-
ence the decree of the circuit court is affirmed.

*Decree affirmed.*