(No. 19988.—

CHARLES H. POWELL *et al.* Appellants, *vs.* ANNA BECHTEL *et al.* Appellees.

*Opinion filed June 20, 1930—Rehearing denied October 11, 1930.*

E. P. HARNEY, FRANK J. BURNS, and JAMES T. BURNS, for appellants.

WALTER C. SCHNEIDER, for appellees.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

James Powell executed a document purporting to be his will in compliance with all required legal formalities, on July 26, 1927, and died about two months later, on September 19. He was eighty-three years old and was ill with intestinal nephritis and chronic myocarditis and confined to his bed for several months before his death. His heirs were his son and daughter, Charles H. Powell and Anna L. Christman, and he had several grandchildren, the children of Charles and Anna. By his will, after directing the payment of all his debts and funeral expenses, he disposed of his property by giving it all to Dan Seybert and Anna E. Bechtel in equal shares, reciting that they had taken care of him for years and were to take care of him for the rest of his life, to pay his funeral expenses, have charge of his

funeral and have a gravestone placed on his grave, and he was to be buried beside his deceased wife. Miss Bechtel was nominated as executrix without bond. The will was admitted to probate in the county court of Kankakee county, and the son and daughter of the testator on December 21, 1927, filed a bill to contest the will on the ground of the lack of testamentary capacity of the testator and of undue influence by the devisees, Seybert and Miss Bechtel, in the execution of the will. The cause was tried at the June term, 1929, and the jury disagreed. At the second trial, at the October term, 1929, the court directed the jury at the close of the evidence to return a verdict in favor of the proponents. The complainants have appealed from the decree dismissing the bill.

During the trial the issue as to the testamentary capacity of the testator was withdrawn by the appellants. The principal question arises on the instruction of the court to the jury directing the verdict.

The will disinherits both the testator's children and devises the whole of his estate to two strangers to his blood. Dan Seybert, the devisee of one-half of the estate, was at one time the husband of the complainant Anna L. Christman, the testator's daughter, and they have a son, Bert Seybert, who is forty-two years old and was a witness. However, they were divorced many years ago and Seybert married and has another son, Franklin, with whom he was engaged in the draying business. For twenty years before the testator's death Seybert and his co-defendant, Anna Bechtel, the devisee of the other half of the testator's estate, lived with the testator. The record does not disclose what was the relation of the three. They lived for seven or eight years before the trial in a house rented of Frank Snyder. Seybert first inquired about renting it, and Miss Bechtel paid the rent by check signed by both of them. Whether they were occupying the house in which they lived at the time of Powell's death as owners or tenants, or who

was the owner, does not appear. The evidence shows that Powell had nine certificates of deposit which were issued to him by the City Trust and Savings Bank between October 24, 1925, and June 27, 1927, for the aggregate amount of $9533.87, which were paid between July 20, 1927, and October 1, 1927, all bearing Powell's indorsement, four of them followed by Seybert's indorsement, the aggregate amount of these four certificates being $1132.20, and five of them, amounting to $8401.67, having Miss Bechtel's indorsement.

The circumstances connected with the preparation and execution of the will were shown by the testimony of W. H. Savary, attorney at law who had practiced in Kankakee from 1895 to 1917 and had known the testator for thirty years and been his attorney for twenty years or more; Louis N. Legris, another attorney, who wrote the will; and Mrs. A. J. Henkel, who with Legris was an attesting witness. In the latter part of June, 1927, Seybert told Savary that Powell would enjoy a visit from him, and Savary and his wife then called upon Powell but there was no talk about business. On July 22 Seybert told Savary that Powell would like to see him on business. Savary was preparing to leave for Canada and he asked Legris to go with him to Powell's. He did so and Savary introduced him to Powell. Powell said he wanted to transfer all his property to Miss Bechtel and Seybert and asked how to do it. He said he had given enough to his children. Savary told him he could transfer it by a conditional deed or will; that Savary was going away but Legris would do the work. Savary and Legris were there ten or fifteen minutes and left the house together. Powell wanted Legris to examine the condition of a suit which he had brought against his son, Charles, as affecting the title of 120 acres of land which he had conveyed to Charles and was seeking to recover, and after an investigation of the record Legris went back to Powell and reported that the case was still in court

and he could not advise Powell how the title would come out. Powell said he wanted to dispose of that property. Legris had no blanks with him at the time. A short time after Seybert came to Legris' office, and afterward Miss Bechtel called him and asked him to come over, saying that Powell wanted to fix up some papers and to see him. Legris called upon Powell, who said that he was ready to fix up the papers and wanted to transfer all his property to Miss Bechtel and Seybert. Legris went to his office, got a blank form of will and returned to Powell's house, where he drew the will as directed by Powell, no one else being present, and read it to Powell, who stopped him after the clause providing for the payment of debts and funeral expenses and disposing of all his property to Miss Bechtel and Seybert, and told him to put in that they had taken care of him for years and were to take care of him for the rest of his life, pay for his funeral expenses, have charge of his funeral, bury him alongside of his wife and have a gravestone placed on his grave. Legris read the will to Powell twice while they were alone in the room. After he had read it the second time Powell wanted to sign it, and Legris called Miss Bechtel, who was in another room, and told her that he needed another witness, and soon after Mrs. Henkel came in. Powell was propped up in bed, given a book or a little board, and signed his name. Mrs. Henkel signed hers and Legris his as witnesses. The persons in the room beside the testator were Mrs. Henkel, Miss Bechtel and Legris. Powell asked Legris how much it was for drawing the will. He had a pocket-book under his pillow which Miss Bechtel got and took out the money. Powell asked Legris to take the will. He placed it in his safety deposit box, where it remained until Powell's death. Seybert was not present on the occasion of any of these visits of Legris except that one when the will was executed, when he came to the door of the room in which Powell was, with Mrs. Henkel, who came at his request to witness the execution of the will.

Miss Bechtel was at the house each time when Savary or Legris was there but was not in the testator's room with them.

On January 24, 1921, Powell had executed two deeds to his children, the one to his son conveying 180 acres and the one to his daughter conveying 137 acres, each of which was subject to a condition subsequent of the payment of $250 on the first day of November and first day of March of each year, beginning with the first day of November, 1922, and upon the failure to make any of such payments the title was to revert to the grantor. (*Powell* v. *Powell*, 335 Ill. 533.) To the January term, 1927, of the circuit court of Kankakee county the testator filed a bill against Charles Powell alleging the execution of the deed of January 24, 1921, to him; that Charles had made default in the condition by a failure to make the payments due on November 1, 1925, March 1 and November 1, 1926; that 60 acres of the land conveyed had been taken from Charles and transferred to the testator's daughter, Anna Christman, and that the conditions as to this tract had been fully and faithfully kept by her. The bill prayed for a cancellation of the deeds and that the title to the 120 acres not conveyed to Anna Christman be decreed to be in James Powell, the testator.

This was the substance of the testimony of the proponents of the will. The contestants proved the facts which have been already stated in regard to the relation of the testator and the two devisees named in his will and the issue to Powell and the payment of the certificates of deposit which have been referred to. They introduced evidence tending to show the friendly relations of the testator with his daughter and with Bert Seybert, the unfriendly relations of the other members of the testator's family with Dan Seybert, their lack of personal acquaintance with Miss Bechtel further than to know her by sight, and the transaction of business for the testator by Miss Bechtel and Seybert.

Mrs. Christman testified that after having notice of her father's death through a telephone call by Seybert to their son she was at the undertaker's in Kankakee where her father's body lay and found Seybert, Miss Bechtel and the undertaker there. She learned that Seybert and Miss Bechtel had control of the funeral. She wanted to have charge of the funeral, but Miss Bechtel and Seybert said they had charge. She demanded to know why, and they said that "papa had made all arrangements with them;" said they had a will. On her demand that they show her the will before they could have the funeral they called Legris, who said that he could not show it until nine o'clock the next morning. Seybert said that they were going to bury the testator beside his wife, Mrs. Christman's mother, and Mrs. Christman asked what authority he had to bury him beside her. He said Powell did not want to be buried there; "that they had a heck of a time persuading him to be buried there, but they insisted on it and finally they made him give up and be buried there." Charles Powell testified that he was not notified of his father's death. Powell held two notes of his daughter at the time of his death, the principal of which amounted to $4100.

An offer was made to show statements of Powell tending to show that he was under the undue influence of Miss Bechtel, and statements of Powell that he had lent money to her for the purchase of the house in which they lived; that he saved her money by his advice; that he paid his board; that he had set up Seybert in farming and once in the draying business and had furnished money for equipping him for those businesses, and the statement of Seybert to one witness that Miss Bechtel would not allow Powell to see the witness unless Seybert went along.

The evidence shows the fiduciary relation of both Seybert and Miss Bechtel to the testator. For twenty years he and the two devisees had been living together in the same house. While the father on the one hand and his son and

daughter on the other were not entirely estranged neither of them visited that house. The testator maintained friendly relations with his daughter and visited her in her home, sometimes for several days, but she had no relations with Miss Bechtel, whom she testified she knew "to see her," and the other member of the trio was her former husband, from whom she had long been divorced. Seybert seemed also to be somewhat estranged from his family, since his son, Bert, his brother, Adelbert, and the latter's wife, Ethlyn, who were witnesses for the complainants, all admitted on cross-examination that they were not on friendly terms with Dan. All this, however, does not tend to prove undue influence of Seybert or Miss Bechtel in procuring the execution of the will. The existence of a fiduciary relation does not, of itself, raise a presumption of undue influence against a beneficiary of the will of a testator to whom the beneficiary sustained a fiduciary relation. The presumption arises in the case of deeds where such relation exists between grantor and grantee or in gifts *inter vivos* or *causa mortis,* but the doctrine has no application to wills. In such case the contestant of the will has the burden of proving not only the existence of the fiduciary relation but also the participation of the persons sustaining the fiduciary relation in procuring the will to be made. The presumption of undue influence arises not from the fact of the fiduciary relation but from the participation of the fiduciary in procuring the execution of the will. The only legal evidence of any activity of the appellees in regard to the will is the notifying of Savary by Seybert of the testator's wish for a visit from Savary and later of the testator's desire to see him on business; the call of Seybert at Legris' office before Legris' third visit to Powell; and Miss Bechtel's telephone call to Legris to tell him that Powell wanted to see him on business and to draw some papers, and her sending for Mrs. Henkel, at Legris' request, to attest the execution of the will. Neither Seybert nor Miss Bechtel was present at any

of the three interviews which Legris had with Powell before that one at which the will was executed or had anything to do with the preparation of the will. Seybert came into the room when Mrs. Henkel came over to witness the execution of the will, and Miss Bechtel helped Powell sit up in bed when he signed the will. No presumption arises from the existence of a fiduciary relation that a will in favor of the fiduciary was executed as the result of his undue influence unless he prepared the will or participated in the preparation or execution of it. *Flanigon* v. *Smith*, 337 Ill. 572; *Bailey* v. *Oberlander*, 329 id. 568.

"Undue influence has been defined to be any improper or wrongful constraint, machination or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely. (*Smith* v. *Henline*, 174 Ill. 184.) The burden was upon the appellees to prove the charge of undue influence. This could not be done by the mere establishment of a fiduciary relation between the testatrix and the appellants. Even if the appellants did occupy a fiduciary relation to the testatrix, that fact did not cast upon them the burden of showing the absence of undue influence, unless there was evidence tending to show that they were in some way instrumental in procuring the execution of the will. (*Lloyd* v. *Rush*, 273 Ill. 489; *Bauchens* v. *Davis*, 229 id. 557.) The undue influence which will avoid a will must be directly connected with the execution of the instrument and be operating when the will was made. (*Gregory* v. *Richey*, 307 Ill. 219; *Bowles* v. *Bryan*, 254 id. 148; *Waterman* v. *Hall*, 291 id. 304.) It must be influence directed towards procuring the will in favor of particular parties, and be such as destroys the freedom of the testator's will and renders the instrument obviously more the offspring of the will of others than his own.—*Snell* v. *Weldon*, 239 Ill. 279; *McCune* v. *Reynolds*, 288 id. 188." *Prinz* v. *Schmidt*, 334 Ill. 576.

The testator stated to the attorney who wrote his will, and the will itself shows, his reason for giving all his estate to the devisees named in his will, and in his second interview with Savary, in which his intention to transfer his property was first mentioned, he told Savary that he wanted to give all to Seybert and Miss Bechtel; that he had given enough to his children already. He had a right to do this, and, though there might be a difference of opinion in regard to the adequacy of his reason for the disposition which he made of his property, in the absence of evidence of undue influence his will cannot be set aside.

It is argued that the court erred in the admission in evidence of the bill of complaint filed by the testator in December, 1927, against his son, Charles, to recover the 120 acres of land which he had conveyed to his son and which he claimed had been forfeited by the breach of the condition precedent for the payment of $500 a year, and in the exclusion of the testimony of a witness, August Radeke. The bill was properly admitted as evidence of the relation of the testator and his son, and the testimony of Radeke ought also to have been admitted as tending to show the friendly relations between the testator and his daughter. Radeke's testimony, which the court excluded on motion of the proponents, was that as county superintendent of highways in 1927, after going to the residence of Mrs. Christman to procure a deed from her for the right of way for a public road which he was under the impression Mrs. Christman was to sign, he went to Powell's house at her suggestion and saw him and he signed the deed. This may have a tendency to show the friendly relations between the testator and his daughter, but in the absence of some evidence of undue influence it was not error to exclude it.

It is also contended that the court erred in not admitting statements of Seybert tending to show undue influence of Seybert and Miss Bechtel over Powell. The rule is well settled that admissions of a devisee concerning the testa-

mentary capacity of a testator or undue influence in procuring the execution of the will are not admissible in evidence where there are devises of separate interests. *McMillan* v. *McDill*, 110 Ill. 47; *Campbell* v. *Campbell*, 138 id. 612; *Cunniff* v. *Cunniff*, 255 id. 407; *McCune* v. *Reynolds, supra; Joyal* v. *Pilotte*, 293 Ill. 377.

At the conclusion of the evidence the proponents made a motion for a peremptory instruction to exclude all the evidence and to instruct the jury to find that the alleged will offered in evidence was the last will of James Powell, which was allowed and the verdict was rendered accordingly. It is argued that the court erred in instructing the jury orally and in entering judgment without the return of a verdict by the jury. Appellants in their brief say the peremptory instruction offered by proponents was not read to the jury and the court's instruction was not in writing. The abstract does not show that the instruction was not in writing or that it was not marked "given." Rule 14 requires the appellant to furnish an abstract sufficient to present fully every error relied upon, and it will be taken to be accurate and sufficient for a full understanding of the questions presented for decision unless the opposite party shall file a further abstract making necessary corrections or additions, and such further abstract may be filed if the original abstract is incomplete or inaccurate in any substantial part. In accordance with this rule the appellants filed an abstract and the appellees an additional abstract. The abstract of the appellees set forth that part of the bill of exceptions showing the proceedings of the court on the motion to direct the verdict more fully than the abstract of the appellants and is as follows:

"Motion in writing to exclude all evidence and to instruct jury.

"Written motion to exclude all the evidence and instruct jury to find alleged will to be the last will of James Powell,

deceased, and attached thereto written instruction and form of verdict, as follows:

" 'We, the jury, find that the writing produced in evidence, purporting to be the last will and testament of James Powell, is the last will and testament of the said James Powell.'

"The court (to the jury): * * * Therefore it becomes my duty to grant the motion, and the form of your verdict will be: 'We, the jury, find that the writing produced in evidence, purporting to be the last will and testament of James Powell, is the last will and testament of the said James Powell,' and the clerk will so enter it.

"To which ruling of the court contestants, by their solicitors, then and there excepted."

In view of the requirement of rule 14 that the abstract must be sufficient to present fully every error relied upon, it must be assumed that the written instruction and form of verdict attached to the motion to exclude all the evidence and instruct the jury was given to the jury and that the jury assented to the verdict as directed by the court. A verdict is not required to be in writing but may be returned by the jury orally in open court. The common law record contains the statement that "the jury is directed to return a verdict as follows: 'We, the jury, find that the writing produced in evidence purporting to be the last will and testament of James Powell is the last will and testament of said James Powell,' and verdict is by the jury returned accordingly. Whereupon judgment is ordered by the court on verdict and for costs versus the complainant." If the instruction was not in writing or was not marked "given" or the jury did not agree to the verdict the record should have been made to show those facts.

The decree is affirmed.                    *Decree affirmed.*